
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 16, 2016

**STATE OF TENNESSEE v. GERALD E. THOMAS, JR.**

**Appeal from the Criminal Court for Knox County**
**No. 106984     Steven W. Sword, Judge**

---

**No. E2016-00372-CCA-R3-CD**

---

The Defendant, Gerald E. Thomas, Jr., pleaded guilty to two counts of aggravated assault, Class C felonies. *See* T.C.A. § 39-13-102 (2014). The trial court sentenced the Defendant to an effective seven years' confinement. On appeal, the Defendant contends that the trial court erred by denying his request for alternative sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Keith Lee Lieberman, Knoxville, Tennessee, for the appellant, Gerald E. Thomas, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Charme P. Allen, District Attorney General; and Willie Lane, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from two assaults on the Defendant's wife. The guilty plea hearing transcript is not included in the appellate record. At the sentencing hearing, the State articulated the factual basis for the pleas as follows:

> [On the first] occasion [the Defendant and the victim] were at their residence . . . [they] had been married for a long time, and that during the altercation, he put both of his hands around her neck and strangled her.
>
> During this time period, she was able to get to the phone, called 911. The 911 call would have been played, and you could hear during that 911 call

her crying out for help and her crying in the background. He was on bond [and] . . . two months later in July . . . [the victim had been admitted to the hospital,] and he had actually come to the hospital and caused such a scene there that the nurse called the police, and they responded.

At that point in time, [the police] spoke with her and discovered that [the victim had gone to the hospital because the Defendant] had beaten her to the point that she hit her head against . . . the toilet in the bathroom. She was knocked unconscious. He proceeded to beat her. There were multiple bruises and abrasions on her whole body[.] He took her from room to room, and during part of the time she was unconscious. The rest of the time she was awake. She was struggling very hard to protect herself. We do have a couple of jail calls that we plan on introducing . . . where [the Defendant] discusses this.

The presentence report was received as an exhibit and reflected that the Defendant had a ninth-grade education and limited literacy skills. The Defendant reported daily marijuana use at the time of the assaults. Relative to the assaults, the Defendant reported to the presentence investigator that he did not do "one of the things" of which he was accused, that the victim "lies [a lot] to get her way," that he considered his convictions fair for what he did, that the victim told him she had an affair with his friend of twenty-six years, that the victim disclosed graphic details of the affair, and that the victim asked the Defendant to have a "threesome" with them. The Defendant reported that he "lost control" and did not intend to hurt the victim, who he said "[e]njoys causing me pain."

The victim testified that she had known the Defendant for nineteen years and that they were married. The victim identified an affidavit of complaint filed in general sessions court on July 18, 2014. The victim said that on that date, she and the Defendant argued, that he hit her several times with a closed fist, that her nose was bloodied, and that she did not prosecute him.

The victim testified that on April 15, 2015, she and the Defendant argued, that the Defendant hit her on the head and placed his hands around her neck, that she called for help, and that the Defendant continued to beat her. She said that the police arrived and that she obtained an order of protection. The victim agreed that the order of protection was dismissed and that the Defendant had been released on bond before June 25, 2015.

The victim testified that on June 25, she and the Defendant argued, that the Defendant had been drinking alcohol, that she began drinking alcohol, and that the Defendant was "teasing me, and I told him that I had had an affair" with the Defendant's friend, whom she identified as Jack. She stated that the Defendant reacted "badly," that he began hitting,

-2-

slapping, and pushing her, that he "drug me from room to room . . . just trying anything." She said that the Defendant had the telephone and that she was unable to call anyone. The victim said that the Defendant knocked her down in the bathroom, that she hit her head on the toilet, and that she lost consciousness. The victim stated that when she regained consciousness, the Defendant was dragging her by her hair through the dining room, where he beat and kicked her all over her body. The victim said that the Defendant took her into the bedroom and raped her. The victim said that she attempted to protect herself, that the Defendant dropped the telephone, and that the victim picked it up and called the police.

The victim testified that the police took her to the hospital "because my eyes were so bad," that the Defendant was present when she returned to her hospital room from having her eyes examined, that the Defendant began "screaming, ranting and raving, saying ugly things," and that hospital security responded. The victim stated that she did not report the rape to hospital staff because at the time, she did not believe marital rape was considered a crime. The victim said that she was in the hospital for one week and that she suffered short-term memory loss as a result of her injuries.

Photographs of the victim's injuries were received as an exhibit. In the photographs, the victim had extensive bruising around her eyes and on her body, particularly the right side.

The victim identified the Defendant's and Jack's voices in jail telephone call recordings. She said that the Defendant had known Jack for "quite a while." In the recordings, the Defendant's tone was conversational. The Defendant told Jack that he needed medication to keep calm in jail and that if he did not take his medication, he would face a murder charge instead of assault. When Jack commented that the victim was in the hospital for three or four days and that the Defendant "must have beat the dog s--- out of" her, the Defendant responded,

> Yeah, I did a number on her. Let's just say when I got started, I didn't want to quit. I mean, I worked on the head, and then when she covered the head, I hit the ribs and the stomach, and when she went and covered that, I went back for the head again. Everywhere she protected, I was hittin' the opposite. [Jack chuckled, and the Defendant laughed.] I'm serious, man. I mean, I didn't mean to beat her that bad, I really didn't. But she kept pushin' it, you know, and pushin' it, and settin' there saying things that she knew was making me madder and madder and madder and she just kept rubbing it in[.]

Jack replied that he had realized the victim "did this on purpose," and the Defendant responded, "Yeah, she did it on purpose . . . . I even asked her . . . '[Y]ou're doing this to try to p--- me off, ain't you?' I said, 'You're trying to get me to hit you.' No! And she was smiling like a m-----f----- too." The Defendant said the victim told him explicit details about

-3-

her sexual activity with Jack and that the Defendant "jumped up and started whaling." The Defendant said that the victim hit him as well and later said that the victim hit him first. The Defendant stated that once he was angry, there was "no stopping" him. He said that he generally bottled up anger until he "had a few drinks and somebody does something to p--- [him] off, well, s--- hits the fan and whoever's in front of the fan gets it." The men discussed the Defendant's prospective sentence of ten years and his dissatisfaction with his attorney, whom he called a "b----." The Defendant expressed his concern that his truck would not be started for an extended period and that it was "too good of a truck" to sit unattended. The Defendant asked Jack to swear he would not see the victim romantically again, and Jack swore he would not. The Defendant said that the victim would try to seduce Jack again, that the victim was intelligent but lacked common sense, and that the victim planned her affair with Jack and the Defendant's arrest. The Defendant stated that he was upset with Jack about the affair and suggested that Jack could "make it up to him" by allowing the Defendant to have sex with his wife while Jack watched.

In another call, a man told the Defendant that he had retrieved the Defendant's wallet and that money was missing from the wallet. The Defendant told the man he was not drunk when he beat the victim and that he was "past p----- off." The man said that the victim called him and asked if the Defendant was going to send her money. The Defendant told the man to tell the victim to call "her boyfriend Jack" for money and that if she was really sorry for cheating on the Defendant "five times" and loved him, she should drop the assault charges. The man responded that the victim did not intend to drop the charges because the Defendant put her in the hospital. The Defendant said he would not have put the victim in the hospital if she had not asked him to have a "threesome" with Jack. The man said that according to an unidentified person who had spoken to the victim that morning, the district attorney was considering charging the Defendant with attempted murder. The Defendant responded that he was going to ask his attorney to take photographs of injuries he sustained when the victim hit him with an ashtray during the altercation and that he wanted the man to tell the victim he would charge her with aggravated assault and credit card fraud. The Defendant denied telling the victim that he would cut her throat when she was in the hospital and said that he called her a "whore" after reading flirtatious text messages between the victim and Jack.

On cross-examination, the victim testified that the Defendant was in jail for about one month after the May 2015 assault, that the Defendant did not know about the affair at that time, and that after the order of protection was dismissed, the Defendant returned to their home. The victim said that the Defendant "always had this thing about having a threesome with [Jack], and he started in on it. Well, I didn't want to hear it, and so finally, I just told him." The victim agreed that she had graphically described her sexual activities with Jack to the Defendant, although she denied having told the Defendant she "rubbed it in." The victim said that she had consumed two alcoholic beverages at the time of the argument, that she did not know how much alcohol the Defendant had consumed, that she consumed alcohol daily,

-4-

and that she took antidepressants. She agreed that one of her medications could cause drowsiness and dizziness and said that she no longer took it. She said that she had been taking other medications and denied being told that some of the medications could cause short-term or long-term memory loss. She agreed that alcohol could affect short-term memory. The victim agreed that she did not tell anyone about the rape until she told the prosecutor on the day of the sentencing hearing.

The victim stated for the trial court that the assaults "terrified" her, that she believed the Defendant was going to kill her, and that the Defendant threatened to kill her previously. She said she had trouble sleeping and eating and wanted "all this . . . to be over with."

The Defendant stated that he knew what he did was wrong and apologized to the victim and to the trial court. The Defendant said that he knew he could never be around the victim again and requested probation. Defense counsel submitted to the court letters indicating that the Defendant was considered a "medium risk" for standard probation and would be accepted by enhanced probation provided he undergo drug treatment.

The trial court found that the Defendant was a Range I, standard offender and that mandatory consecutive sentencing applied because the Defendant committed the second aggravated assault while released on bond for the first aggravated assault. Relative to mitigating factors, the trial court found that the Defendant "receive[d] some provocation from his wife concerning her description of what had happened . . . [W]hat was said to him is something that . . . would stir up a passion in [a reasonable person.]" *See* T.C.A. § 40-35-113(13) (2014) ("If appropriate for the offense, mitigating factors may include . . . [a]ny other factor consistent with the purposes of this chapter.").

Relative to enhancement factors, the trial court credited the victim's testimony and found that factor (1) applied because the Defendant had a history of criminal behavior, including misdemeanor convictions and violent behavior toward the victim. *See id.* § 40-35-114(1) (Supp. 2012) (amended 2015, 2016) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). The court found that factor (13)(A) applied because the Defendant committed the second assault while released on bond for the first assault. *See id.* § 40-35-114(13)(A) (Supp. 2012) (amended 2015, 2016) ("At the time the felony was committed . . . [the defendant had been released] on bail or pretrial release, if the defendant is ultimately convicted of the prior . . . felony[.]").

The trial court considered the enumerated factors in Tennessee Code Annotated section 40-35-103 and found that the Defendant's criminal history, standing alone, did not weigh in favor of confinement. Relative to the seriousness of the offense, the court found that the first assault was "more than just a simple assault," that the victim was choked to the

point of almost losing consciousness, that the second assault was "an extremely, extremely brutal beating," that the victim's description of the events was credible, and that the victim's testimony was corroborated by the Defendant's statements in the jail telephone calls. The court noted that it gave this great weight and that "to do anything less than [send the Defendant] to the penitentiary would seriously depreciate the seriousness of the extraordinary beating that he rendered to [the victim]." The court found that confining the Defendant would serve as a deterrent to similarly situated defendants and that domestic violence was a local and national problem. The court found that the Defendant had not been placed on probation recently or frequently.

Relative to the Defendant's potential for rehabilitation, the trial court found that when the Defendant had a conversation with his friend about beating the victim, the Defendant laughed. The court stated that it considered two consecutive sentences of split confinement but did not believe the Defendant was remorseful. The court commented that the Defendant's laughing in the jail telephone recording "sent you to the penitentiary for a lengthy period of time." The court found that the Defendant had little potential for rehabilitation and that confinement was warranted.

Relative to the length of the sentences, the trial court found that the minimum sentence was appropriate for the first count and that because the Defendant was released on bond when he committed the second count, the minimum sentence plus one year was appropriate. The court sentenced the Defendant to an effective sentence of seven years. This appeal followed.

The Defendant contends that the trial court erred by ordering confinement. He argues that the court improperly relied upon the Defendant's laughing in a recorded jail telephone call and that the court's stated purpose of not depreciating the seriousness of the offense had already been accomplished by the eight months the Defendant had served in confinement at the time of the sentencing hearing. The State responds that the court did not abuse its discretion. We agree with the State.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). Generally, probation is available to a defendant sentenced to ten years or fewer. T.C.A. § 40-35-303(a) (2014). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2014); *see Trotter*, 201 S.W.3d at 654.

As a preliminary matter, we note that although the guilty plea transcript is not included in the appellate record, the parties raise no issues related to the guilty plea. We conclude that the record is sufficient for a meaningful review of the issue presented. *See Caudle*, 388 S.W.3d at 279 (holding that when a guilty plea transcript is not present in the appellate record, this court should "determine on a case-by-case basis whether the record is sufficient for a meaningful review under the standard adopted in [*State v. Bise*, 380 S.W.3d 682 (Tenn. 2012)]").

The trial court found that confinement was necessary to avoid depreciating the seriousness of the offense. It also found that confinement in this case would serve as a deterrent to similarly situated individuals. The court stated that it placed great weight on the seriousness of the victim's injuries and on the Defendant's lack of remorse, as evidenced in the recorded jail telephone calls by the Defendant's laughing while discussing how he beat the victim.

The record reflects that in making its determination, the trial court relied upon all the evidence, not only the Defendant's laughter in the recordings. The Defendant assaulted the victim three times, and he exhibited a pattern of escalating violence toward the victim, culminating with a severe beating that merited a one-week hospitalization. The final assault occurred while the Defendant was released on bond for the first assault. After the victim was hospitalized, the Defendant followed her and verbally abused her until hospital security removed him. Although the record does not reflect the Defendant violated the terms of the order of protection, the final assault occurred almost immediately after the order of protection was dismissed.

In the jail telephone calls, the Defendant discussed the strategy he used while beating the victim, and he and Jack laughed about it. The Defendant blamed the victim for making him angry enough to beat her and said that she planned the affair in order to provoke him. The record supports the trial court's finding that the Defendant's laughter in the context of the jail conversation indicated a lack of remorse. The Defendant's lack of remorse, his history of assaulting the victim in spite of police intervention, and the severity of the victim's injuries supports the court's determination that confinement was necessary to avoid depreciating the seriousness of the offense and to deter other individuals from similar acts. The trial court did not abuse its discretion by ordering the Defendant to serve his sentence in confinement. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE